Good morning, your honors. My name is Nelson Meeks. I'm here on behalf of the plaintiff, Elvin Guramajo, and his wife. At the outset, I think the most important thing to look at is the BIA's decision of October 31, 2007. In short, it used the wrong standard. It says that my client is ineligible for ineffective assistance of counsel because he was not substantially prejudiced by ineffective assistance of counsel. I suggest that that is not the standard. The standard is whether the ineffective assistance may have affected the outcome of the proceeding. I'm not sure of that. There's that new Veterans Administration case, Somebody v. Shinseki, that seems to say you apply a prejudice standard across the board in these administrative law cases. Do you know if that's correct? I am unfamiliar with that case, your honor. It came down last term. The case that I am familiar with is the case that came out of this circuit regarding ineffective assistance, Marabella v. Ashcroft. Let's say you're right that that's still the law. And let's say that the wrongs that you claim, that all your claims of the wrongs are correct. Even under the more lenient standard, can there be prejudice if the application for asylum was more than a year after arrival in the United States? As I recall, it's the burden of the asylum seeker to prove that he applied for asylum within a year of arrival. People can't just sneak in and then just wait until they get caught before they ask for asylum. That's a very good point. And when I use the term asylum, there are a host of reliefs beyond just asylum. That application includes withholding of removal, which may be filed at any time in Convention Against Torture. Again, something that can be filed at any time. They both go to the same root cause. That is, was there some form of fear of physical harm in the country of origin? So whether or not he has an excuse for a one-year delay really doesn't control, I don't think, because he still was denied the opportunity to seek withholding of removal, which he certainly would be within his rights to seek if he was one year late, barred. Back to the Mara Vala versus Mara Vala. The recent case out of this circuit again, July 1st, 2011, Evgen, and I apologize for my pronunciation. That's 646F.3D672, which government counsel graciously provided to the court. It cites Mara Vala as authority for the proposition of the standard for determination as to whether or not prejudice, the prejudice standard for a referral back to BIA. How do you get around the number bar question and the tolling question? I mean, BIA relies on both of those. That is to say, this is the second motion to reopen. Okay, the number bar I think is an easy one to get around. If the court looks at the administrative record of the declaration that was purportedly signed by my client, it's at page 84 of the administrative record. And that I think is important to read to understand what happened in this case. This is an affidavit justifying the first motion to reopen. The facts in it are false. They are almost all false. If the court looks at the signature on page 86 and compares it against items that are legitimate signatures of my client, it's pretty easy to see that's not his signature. My client declares, and I'm not here to give evidence. I can't, so I won't. Of course. But according to his declaration, the facts in that piece of paper justifying the first motion to reopen, all false. His kid was not sick. There was no person named Julio. And that appears again and again. Now, interesting, if you look at this thing carefully. I understand what you're saying in terms of the falsity. How does that help you get around the number bar? The motion to reopen was a fraud. It was filed by an attorney's office. I don't know if it was the attorney or somebody in his office, but an attorney's office that sent this to the BIA purportedly on behalf of my client. My client knew nothing of the facts that were in it. And there's nothing in this motion that is justified by anything. So your argument is for purposes of motion to reopen, that doesn't count as an earlier motion to reopen because your client had no part in it? Correct, Your Honor. Okay. It's a flat-out fraud. And how do you get around the 90-day tolling period on motion to reopen? Again, ineffective assistance of counsel, where an alien is prevented from prosecuting his case because of fraud or some sort of impropriety on the part of counsel, I would suggest is supported by the recent Ninth Circuit case. And it depends on when he finds out about the impropriety and the prejudice. Right. So just to state the law in kind of abstract form, the 90-day period is tolled or doesn't start to run until your client knows of the ineffective assistance of counsel. And at that point, the 90 days starts to run. When did your client learn of the ineffective assistance of counsel such that the period starts to run and the tolling period is finished? He learned sometime around March of the allegation that his son was ill. And his reaction to that was, my son's not sick, I have no medical records, and this affidavit says he's going to have medical records. So he learned of that falsity at that time. And then when is the second or call it the second, the second motion to reopen filed? Well, let me continue. There's another timeline in this chain of events. Thereafter, there was another meeting with clients who figured out, well, why did you leave Guatemala? And it's at that time the information is disclosed that, and this isn't something aliens like to talk about, I don't think, any time that they're persecuted. But that's the time it was discovered that he had potentially a legitimate claim for political asylum and related relief, and that would have happened at the end of March and early April. The motion to reopen was filed June 22nd. And what evidence do we have in the record that he learned that he might have a legitimate asylum claim in late March, early April? The evidence in the record is his declaration for the motion to reopen. And according to this Court's precedent, that's got to be presumed to be true. That's when he would have communicated to counsel, myself, the chain of events leading to his departure from. We've got two possible arguments here that he's going to make on the merits if he can reopen. One of them would be cancellation of removal, at which point he's going to present hardship and so on. The other one is going to be asylum. He's obviously so late on asylum that he's going to have to show some form of changed circumstances. Would he be able to show that? Whether he can or cannot is not in the record. Certainly what is in the record is the fact that he was shot at. They believed him to be a guerrilla. He fled in the belief that they thought he was a guerrilla and that he might get harmed. That's in the record. As a practical matter, until it's reopened, we would need to research the detail as to changed circumstances. And circumstances certainly are changing. Okay. Listen, you've got 45 seconds left. Let's hear from the government, and we'll make sure to give you enough time to respond. We won't restrict you to 45 seconds. Great. Thank you so much. Thank you. Good morning, Your Honors. I'm Erica Miles for Attorney General Holder. Could you tell us what is the appropriate prejudice standard? The appropriate prejudice standard is whether or not the attorney's actions may have affected the outcome of his case. And the Board cited the Lara Torres case in its decision, and the Lara Torres case articulates this very standard. So we're not contesting that it may have affected the outcome. But regardless here, the Board did not abuse its discretion in denying the motion to reopen. The Board asserted two bases, both of which are amply supported in the record, and either of which provides a reason for this Court to deny the petition for review in this case. So we have the failure to exercise due diligence is one finding by the Board, and the failure to demonstrate prejudice. And both of those findings by the Board are supported in this record. As to prejudice, addressing the Court's comment that if this case were reopened and remanded, he would apply for cancellation and asylum, he did not, before the Board in his motion to reopen, say that he is seeking cancellation again. In fact, he said he did not have a viable cancellation claim and renounced that he ever should have applied for it. So right now, the only thing that he presented to the Board was that he would seek to apply for asylum, only asylum. He did not assert that he could apply for withholding or CAT. So those are not on the table. And as to which time was it that he said, I'm not applying for CAT relief or withholding of that? He didn't say he's not applying. He just said he seeks to apply for asylum. He did not advance any argument that he could demonstrate that he, in reopened proceedings, that he's eligible for withholding or CAT. But regardless, even assuming that that could be on the table, which we do not concede it is, as for asylum, this Court recognized that there is a one-year bar. He didn't address it before the Board. He didn't proffer how he could somehow overcome the statutory bar and demonstrate eligibility. So he could not show prejudice as to asylum whatsoever. But as to even looking at the elements of asylum and withholding, he did not speak at all to any fear of harm if he returns. There's no comment whatsoever saying that he is afraid to go back to Guatemala. He left in 1990, and he filed his motion in 2007. A lot has happened. And the record shows that he has a mother, three sisters, and two brothers living in Guatemala that have been in Guatemala this whole time. He didn't address the fact that he has family members there as well. So just all of this goes to demonstrate that he filed a motion alleging ineffective assistance, saying he was prejudiced because he should have been able to apply for asylum. This demonstrates that whatever happened before the immigration judge, the first time around in his proceedings, and the withdrawal of his asylum application, it would not have changed the outcome of his proceedings if he went forward on an application for asylum. Let me ask you this, if I can, which is in a sense off to one side from the merits of the arguments you're now making. We are aware that the Attorney General has a new policy with respect to various immigration cases. If this were a case coming before the Attorney General at the initial stages, not a case at this later stage, how would it be handled under the Attorney General's new policy? That is to say we don't have any criminality, we've got people who are working and so on. Could you tell me how this case would be handled? Well, I couldn't give you a firm answer as to how this case would be handled, because our office and the committee that is informed are still working out the details as to what types of criteria would or would not sort of trigger this, I believe you're referring to sort of a prosecutorial discretion. When I read that memo, I think it was the Morton memo or something, it looked like for people who are a good citizen in every way, except they're not a citizen at all, they're stuck in. Well, the Morton memo is one. It looked like they wouldn't be removed. Is that the plan? That's not the plan, and there is no firm plan in place as of yet. There are criteria that are still being bounced around, and they're trying to figure out exactly what types of cases will fall under the umbrella of the Morton memo, separate from this other policy to which you're referring. However, that said, I can assure you that our office is cognizant of this policy, and every case that's before us we do take a look at with that memo and policy in mind, and our office has decided that this case is sufficient to go forward at this stage. And sufficient to go forward at this stage because the policy at this point doesn't dictate that they shouldn't be allowed to be, as it were, given some administrative discretion, or because you know what the rules are going to be and therefore it doesn't qualify? Tell me more. We've always had our own internal policy to just take a look at cases and review all the facts and circumstances, and so it's been this informal sort of behind-the-scenes policy in any case. Well, you know, Judge Kleinfeld and I have seen these cases for years, and the informal policies over the years have been sometimes very harsh. I recall, oh, this was several years ago, Judge Milan-Smith and Judge Clifton and I were on a panel down in Pasadena. As I recall, it was Judge Milan-Smith who started it. Then Judge Clifton chimed in, and then I didn't want to be left out, so I said the same thing. But we all said, why in the world are you pursuing this case when, in fact, there are lots of lawbreakers out there among the alien population? You've gone after perfectly law-abiding da-da-da-da-da-da-da. If there was a policy that your office was following of sort of prosecutorial or administrative discretion, the policy was to take the most sort of law-abiding, productive noncitizens and get rid of them. So when you say we've always had a policy, we've seen that policy in operation, and I don't think it is the policy that appears to be on the table now. My only observation, incidentally, was similar, that basically no discretion is exercised. If there's a good legal case, the formerly justice and now DHS pursue it. They get an order. It's final for removal, and then they don't do anything about it, and the alien stays here anyway. Well, that happens at times, but in this case. In my brief experience, or fragmentary information, it happens most of the time. Well, a lot of those cases don't come before you, for example, when they're ordered removed early on and they are removed. But in any event, this case, it's not involving just an order of removal. This is a second motion to reopen. The point of this, I think, is are we wasting our time if we do an opinion on this case, for example, because really nothing is going to happen? Citizens of Guatemala are being removed to Guatemala. That's, in fact, happening. So if this order of removal becomes final, there is a distinct possibility that he could be removed. And if the policy does turn out to be that these good citizens in every way except they're not citizens don't get proceedings filed against them, will this fellow be removed anyway? Well, what I wanted to comment on was that even though we're moving forward on this case, it's legally sound, the policy that we were just discussing, oftentimes will or could involve the individual requesting DHS to then defer their removal. But that is after proceedings are complete. And that's not because they have any form of relief, such as cancellation or asylum, but because DHS decides to exercise that type of discretion. But that is, again, once the legal case and the legal proceedings are done. And that memo does address DHS's ability to do that after the case is final and complete as well. One of the things that concerns me, and Judge Kleinfeld and I have not discussed this previously, but he and I share some of these concerns. They may be variant in some small degree. But one of the things that concerns me, it seems to me possible that once this policy is formulated, we might find that these people would come under the non-prosecution policy, or we might find that if we weren't so far along in the process with them, they would have come under this policy. And it's a question not of policy then and what the criteria are for relief, so much as it's a question of timing as to when they got caught up in the system. It occurs to me that there's a possibility, as you probably know, we have a mediation office, that we could refer this to mediation so that these things could be brought out. I mean, we as judges sitting here are quite limited in terms of the options that we have. Different things can sometimes happen under the umbrella of mediation. Would your office be willing to take this case to mediation? Of course, the case would still stay pending in front of us while the case would be mediated. This is not a typical case that we would, at the outset, consider mediation. But if the court is requesting that we be amenable to that, we would be amenable to mediation. However, from what I understand from our office's director, the types of cases that would come under this policy you're referring to are going to be very rare. And they're not, it's not going to, it's going to require many factors, from what I understand. And so he did tell us we could emphasize that it's not going to happen in these types of majority of cases, such as this one, usually, that appear before this court. So just wanted to pass that information along as well, that the cases that we are moving forward on at this stage, we have looked at, and at this juncture determined that they're not ones that would fall under, that stand out as a case that would be one of those rarities that they get that. But if you would like to order mediation, we will be amenable to mediation. Okay. Now, as you may or may not know, we don't confer ahead of time, so I'm not speaking for the panel at this time. Okay. Thank you very much. Okay. Thank you. Mr. Meeks, do you have a response? Thank you, Your Honors. And I think mediation is a great idea. Okay. That doesn't surprise me. I'd like to hear a response to the contention Government Counsel made that in the motion to reopen, the only claim that's preserved is for asylum, but he didn't apply for asylum within a year. The original asylum application says on it it's asylum in withholding. That was what was withdrawn. He's complaining about the fact that his asylum in withholding application was withdrawn. I'm not sure that's precisely an answer to the question. I'm sorry, Your Honor. In the motion to reopen that's in front of us, did the motion for reopen ask for reconsideration of the cancellation of removal decision? Oh, I'm sorry, Your Honor. It did not. Okay. It did not, Your Honor. So it asked only for reconsideration of asylum? Asylum and impliedly the related relief. Does that mean that if you won here and we said they should have granted the motion to reopen, it would go back to them and they'd reopen with respect to asylum, and then you'd lose on asylum because your client didn't apply within one year? If it was limited to asylum, it's still an open question as to whether there were changes in circumstances within the one year preceding the time that he filed for asylum and withholding. His application would be... In Guatemala that's pretty clear, isn't it, that it used to be really bad and now it's not so bad according to the country reports? In some respects, that's true. In other respects, if someone was a witness of certain things that transpired in Guatemala, those prosecutions are still ongoing, and the fact of those prosecutions does put people now at risk that weren't formerly at risk. Further, with regard to the wife, there's lots of country condition reports that have surfaced that shows that, in fact, this court in Perdomo last year ruled that women as a subgroup, as a social group may have standing to seek political asylum solely on that basis, and those are new developments in Guatemala. Okay. Now, government counsel stated that the outcome wouldn't be any different. I'd like the court, suggest that the court look at Maravella and the last two paragraphs of that case, where it says the BIA denied Maravella, quote, because the outcome would have, because they failed to show the outcome would have been different but for the alleged ineffectiveness. This court went on to say that wasn't the right question to ask. The right question was it should have been asked only whether counsel's deficient performance may have affected the proceeding, not whether there would have been a different outcome. And government counsel agrees with you that the may have been is the standard. Yeah, may have been is the standard. Whether or not there would have been a different outcome isn't part of it, and that's what I believe I heard the government arguing. I think you and the government counsel are on the same page with respect to that standard. Yeah. Now, with regard to the citing of Torres, I think that case is way off point because that involves a case where there was a 10-year requirement for cancellation, and that clearly wasn't met. In this case, asylum and withholding are things of the same stripe, and whether he can show he has an excuse for the one year is not there, and withholding certainly he could ask for. Okay. You're over time, so if you have one last point with which you would like to sum up. I'd just like the Court to direct its attention at the retainer agreement at page 167, look at its date, 10-14, look at the declaration that was forged at the record at 84, which was signed 12-2105. You can see that this declaration for ineffective assistance to counsel is essentially he's pointing to himself. Okay. Okay. Thanks so much. Thank both sides for their arguments. Thank you for the extra time, Your Honor. Of course. Gamal versus Holder is now submitted for decision.
judges: Hug, Kleinfeld, Fletcher